**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| PRINCE SOUTHERN, | ) CASE NO. 1:19-cv-00067 |
| Plaintiff, | ) |
| v. | ) MAGISTRATE JUDGE DAVID A. RUIZ |
| BASF CORPORATION, | ) |
| Defendant. | ) **MEMORANDUM OPINION AND ORDER** |

## I. Procedural History

On September 24, 2018, Plaintiff Prince Southern ("Plaintiff") commenced an action against Defendant, BASF Corporation, in the Court of Common Pleas for Lorain County, Ohio, wherein Plaintiff alleged employment discrimination under Ohio Revised Code ("O.R.C.") § 4112.[1] (R. 1). On January 10, 2019, Defendant filed a Notice of Removal on the basis of diversity jurisdiction. *Id*. Now pending is Defendant's motion for summary judgment (R. 17), which Plaintiff has opposed (R. 18), and Defendant further supports via a reply brief. (R. 20).

## II. Summary of Key Facts

### A. Hiring

In late 2016, Defendant had two openings for Contact Supervisors at its Elyria, Ohio

---

[1] The Complaint references race, color, and national origin discrimination, but Plaintiff's opposition to the motion for summary judgment clarifies that he is pursuing only race discrimination. (R. 19, PageID# 925) ("Mr. Southern is pursuing a race discrimination claim against BASF under [O.R.C. §] 4112.02.").

facility—one in the north end of the plant and one in the south end. (R. 17-4, PageID# 813, Deposition of Paul Vidmantas Titas ("Titas Depo.") at pp. 7-8; R. 17-2, PageID# 774). Contact Supervisors are front line supervisors who manage the shifts and day-to-day work of hourly operators and are responsible for the compliance and enforcement of all safety, environmental, and plant policies and procedures, and for the development and direction of supervised employees. (R. 17-2, PageID# 774; R. 17-3, PageID# 793; R. 17-4, PageID# 813, Titas Depo. at p. 7; R. 15-1, PageID# 205, Deposition of Prince Southern ("Southern Depo.") at p. 97). Plaintiff, an African-American, submitted an application as a part of the hiring process, and appeared for an in-person interview with the Elyria facility's Site Director, Michele Barney and its Operations Manager, Leon Zavodnik (R. 15-1, PageID# 198-199, Southern Depo. at pp. 70-71, 75-76; R. 17-2, PageID# 773; R. 17-3, PageID# 792).[2]

Defendant hired Plaintiff as a Contact Supervisor, and Plaintiff began working for Defendant on or about January 23, 2017. (R. 15-1, PageID# 198, Southern Depo. at p. 70; R. 17-2, PageID# 774). Plaintiff's employment was on an at-will basis. (R. 15-1, PageID# 199, Southern Depo. at pp. 73-74). Plaintiff was to work in the south end of the Elyria plant, reporting directly to the Production Manager, Titas. (R. 15-1, PageID# 205, 217, Southern Depo. at pp. 98-99, 146-147; R. 17-2, PageID# 7742; R. 17-3, PageID# 793). The other Contact Supervisor position was filled by Jacob Elphee (Caucasian), who was to work in the north end of the Elyria plant. *Id*. Unlike Plaintiff, Elphee reported directly to Operations Manager Zavodnik, and not to Titas. (R. 15-1, PageID# 217, Southern Depo. at pp. 146-147; R. 17-4, PageID# 813, Titas Depo.

---

[2] Both Barney and Zavodnik, who decided to extend an offer of employment to Plaintiff in consultation with Defendant's Human Resources department, are Caucasian. (R. 17-2, PageID# 773; R. 17-3, PageID# 792).

at p. 8; R. 17-3, PageID# 794). Both Plaintiff and Elphee were external hires who had not previously worked for Defendant. (R. 17-4, PageID# 819, Titas Depo. at p. 30; R. 17-4, PageID# 794).

**B. Training**

Plaintiff contends that Defendant provided Elphee "more time" and "better training." (R. 15-1, PageID# 217, Southern Depo. at p. 148). Plaintiff's supervisor, Titas, testified that Defendant did not have a "set training program" for either Plaintiff or Elphee. (R. 17-4, PageID# 819, Titas Depo. at p. 30). Defendant asserts that Contact Supervisors at the Elyria facility are not trained in a classroom setting, but rather learn their job responsibilities by following, observing, and interacting with other supervisors. (R. 17-4, PageID# 819, 822, Titas Depo. at pp. 31, 44-45; R. 17-2, PageID# 775; R. 17-3, PageID# 794). According to Titas, he "adjusted the schedules of three other south end Contact Supervisors … in order to get Mr. Southern more training time." (R. 17-5, PageID# 829, Titas Declaration at ¶13). Titas also testified that he spoke with Plaintiff about his readiness to lead his own shift, and that Plaintiff represented that he was ready for his own shift. (R. 17-4, PageID# 819, Titas Depo. at p. 30). Titas stated that Plaintiff did not run his own shift until mid-April of 2017 — over two and a half months after he began working for Defendant. (R. 17-5, PageID# 829, Titas Decl. at ¶15). Despite allegedly receiving more training than Plaintiff, contemporaneous hire Elphee first began supervising his own shift on March 19, 2017. (R. 17-3, PageID# 794).

In addition to "on the job" training, Defendant also states that it trains its Contact Supervisors through computer-based training courses ("CBTs"), which are designed to assist employees learn their duties, and new employees are expected to timely complete them. (R. 17-5, PageID# 829, Titas Decl. at ¶16; R. 17-3, PageID# 794). Plaintiff understood that he was

3

required to complete his CBTs and believed the expectation was fair. (R. 15-1, PageID# 207, Southern Depo. at pp. 107 -108). But as of May 11, 2017, he had not completed that training requirement as directed; and his supervisor Titas emailed him about their importance and extended the deadline. (R. 17-5, PageID# 829, Titas Decl. at ¶16). Plaintiff testified at his deposition as follows:

> Q: Did you think it was fair [for Titas to expect you to complete your CBTs by the following Friday]?
>
> A: That's what I wrote. Yes.
>
> Q: Did you do it?
>
> A: I got through some, not all. So I guess that would be a no. I didn't complete it on that date.
>
> ***
>
> Q: Do you think it was important for you to do the [CBT] training?
>
> A: Yes.
>
> Q: Was it part of your job to do the [CBT] training?
>
> A: Yes.

(R. 15-1, PageID# 206-207, Southern Depo. at pp. 104 -105). Two-weeks later, on May 31, Titas again emailed Plaintiff because he had not completed his CBTs, a core responsibility of his job. (*Id*. at PageID# 207, Southern Depo. at pp. 105 -108)). By contrast, according to Elphee's supervisor Zavodnik, Elphee timely completed his CBTs. (R. 17-3, PageID# 794). Per Titas's deposition testimony, none of the other Contact Supervisors on his team struggled with completing their CBTs to the same extent as Plaintiff. (R. 17-4, PageID# 821, Titas Depo. at p. 44).

**C. Allegations of Sleeping on the Job**

Defendant had a set of "Plant Rules" at its Elyria facility "as a part of its efforts to ensure the safe and efficient operation of its plants." (R. 17-2, PageID# 775). Plant Rule 6(g) specifically states "Employees shall not sleep on site." (*Id*. PageID# 781). Defendant asserts that the "Plant Rules" are posted in common areas at its Elyria facility. (*Id*. at PageID# 775). Plaintiff did not dispute that an exhibit shown to him at the deposition constituted the general Plant Rules. (R. 15-1, PageID# 209, Southern Depo. at pp. 113-114). Plaintiff indicated that he was "somewhat familiar" with the rules. *Id.* As a Contact Supervisor, Plaintiff was responsible for knowing and helping to enforce the Plant Rules. *Id*.

The first paragraph of the rules states that "[e]mployee claims of unfamiliarity with the rules will not be considered an acceptable excuse for failure to comply." (R. 17-2, PageID# 780). The rules further provide that "[a]n employee who violates any of these rules or who fails to maintain proper standards of conduct is subject to disciplinary action up to and including discharge." *Id*. Titas testified that he personally observed Plaintiff sleeping at work once or twice, including during a morning safety meeting. (R. 17-4, PageID# 815, Titas Depo. at pp. 14-15). Another Contact Supervisor also reported concerns to Titas that Plaintiff was sleeping on the job. (*Id*. at PageID# 819, Titas Depo. at pp. 31-32). Titas testified he spoke with Plaintiff regarding the issue and "believed it was behind us." (*Id*. at p. 32).

Thereafter, sometime in May or June of 2017, Titas learned that photographs were circulating around the Elyria facility allegedly depicting Plaintiff sleeping on the job. (R. 17-4 at PageID# 816, Titas Depo. at p. 17; R. 17-5, PageID# 831, Titas Decl. at ¶26). Titas obtained the photographs and shared them with Zavodnik and Barney. (*Id*. at pp. 18-19). Plaintiff admits that the photographs in question are of him. (R. 15-1, PageID# 201-202, Southern Depo. at pp. 84-

5

85). He testified that he thought the photographs were taken a few days before his termination. (*Id*., PageID# 203, Southern Depo. at p. 89). He also admits that he was aware of the rule prohibiting sleeping on the job site. (R. 15-1, PageID# 210, Southern Depo. at 119). However, Plaintiff denies that he was actually sleeping in the photographs. (R. 15-1, PageID# 202, Southern Depo. at p. 86). Rather, Plaintiff testified at his deposition as follows:

> Q: Mr. Southern, have you seen these photographs that have been marked as Exhibit E?
>
> A: Yes.
>
> Q: Can you tell me what they are?
>
> A: These are photographs of me. They said I was sleeping in the control room.
>
> And then the second one is me in the golf cart. They said I was sleeping there.
>
> \*\*\*
>
> Q: Do you see how somebody looking at these photographs might think you were sleeping?
>
> A: I can see where if someone is looking – thinking that I was sleeping and then saw these photographs would probably assume that I was before they looked into the incident.

(R. 15-1, PageID# 201-202, Southern Depo. at pp. 84-85, 87).

**D. Mobile Device Use and Social Media Posts**

Defendant's aforementioned "Plant Rules" also contains a provision—Rule 6(d)—that specifically states: "The use of personal electronic devices including cell/mobile telephones is not allowed anywhere in the plant except in the office areas, locker rooms, main cafeteria, and designated break areas and can only be used during breaks/lunch periods or before/after the shift, except in certain emergency situations." (R. 15-1, PageID# 360, Southern Depo. at Exh. J).

Plaintiff was aware of rules prohibiting the use of cellphones at the Elyria facility. (R. 15-1, PageID# 210, Southern Depo. at pp. 117-119). Plaintiff states that if he had seen an employee he supervised taking "selfies" (pictures of himself/herself), he would have instructed the employee to put his cellphone away "the first time," and "written him up" for a second infraction. *Id*.

Despite the prohibition against cell/mobile device use, Plaintiff used his cellular phone to take several pictures of himself at the Elyria facility. (R. 15-1, PageID# 201, 208, 355-358, Southern Depo. at pp. 81, 109 -112, Ex. I). Plaintiff admits these worksite pictures were then posted to his Facebook account and also that they should not have been posted on-line, but he alleges they were posted by a family member. (R. 15-1, PageID# 208-209, Southern Depo. at pp. 109-113).

**E. Termination Proceedings**

Defendant's management personnel, Barney, Zavodnik, and Titas, discussed how to proceed in light of the worksite pictures taken by Plaintiff and his alleged sleeping on the job; and they also consulted with Human Resources. (R. 17-2. PageID# 776; R. 17-3, PageID# 795; R. 17-4, PageID# 818, Titas Depo. at pp. 26-28). Titas offered his opinion that termination was "the best path," but did not make the final decision to terminate Plaintiff's employment. (R. 17-4, PageID# 818, Titas Depo. p. 27; R. 17-5, PageID# 832). Barney and Zavodnik decided that, based on Plaintiff's conduct, Plaintiff's employment should be terminated. (R. 17-2, PageID# 776-77; R. 17-3, PageID# 796). The aforementioned managers, along with a Human Resources representative, met with Plaintiff on or about June 21, 2017, and during the meeting, informed Plaintiff his employment was being terminated. (R. 15-1, PageID# 200, Southern Depo. at pp. 77-79; R. 17-2, PageID# 777).

Defendant's summary judgment filing asserts that, during Plaintiff's employment, he did

7

not report any "concerns of race (or any other) discrimination, and Plaintiff admits that he did not do so." (R. 17, PageID# 557). Plaintiff's filings do not refute that assertion. Further, Defendant asserts that its decision to terminate Plaintiff's employment was based on the above legitimate, non-discriminatory reasons and denies the decision related in any way to his race. (R. 17-2, PageID# 777; R. 17-3, PageID# 796; R. 17-5, PageID# 832).

### III. Summary Judgment Standard

Summary judgment is appropriate only if the moving party demonstrates there is no genuine dispute of material fact on an issue that would entitle the movant to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the non-movant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is only genuine, however, if a reasonable jury could resolve the dispute and return a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. Law and Analysis

The Complaint sets forth only one cause of action, an allegation that Defendant "engaged in a pattern or practice of employment discrimination toward [Plaintiff] … on account of his race/color" in violation of O.R.C. § 4112.02. (R. 1-1, PageID# 11). Under O.R.C. § 4112.02: "[i]t shall be an unlawful discriminatory practice: (A) For any employer, because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person

8

with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."[3] Ohio Supreme Court cases "have determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) et seq., Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R. C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128 (Ohio 1981) (finding Title VII case law applicable to cases involving alleged violations of O.R.C. § 4112); *see also Kirkland v. St. Elizabeth Hosp. Med. Ctr.*, 34 F. App'x 174, 177 n.2 (6th Cir. 2002) (applying Title VII case law to claims under O.R.C. § 4112); *accord Sosby v. Miller Brewing Co.*, 211 Fed. Appx. 382, 386 (6th Cir. 2006).

In a Title VII action, and therefore also in an Ohio § 4112 claim, a plaintiff can establish race discrimination "either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). In the case at bar, Plaintiff admits to a lack of direct evidence of discrimination, but asserts this action involves a circumstantial evidence claim.[4] (R. 19, PageID# 926).

---

[3] Similarly, under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

[4] Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007) (overruled on other grounds) (citation omitted)). Direct evidence includes comments "from the lips" of the employer "proclaiming his or her ... animus." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citation omitted). *See also Coburn v. Rockwell Automation, Inc.*, 238 Fed. Appx. 112, 116 (6th Cir. 2007) (stating that "direct evidence is found ... where a statement by an employer directly shows there is a discriminatory motive.") A discriminatory comment is attributable to the employer when it is made by a "decision maker." *Id.* at 117-118.

In order to establish a *prima facie* claim based on circumstantial evidence, the Plaintiff must satisfy the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). "Where there is no direct evidence of race discrimination, a plaintiff may prove a *prima facie* case of racial discrimination by showing that [he] (1) is a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated members outside the protected class." *Vitt v. City of Cincinnati*, 97 Fed. Appx. 634, 639 (6th Cir. 2004) (citations omitted). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *See, e.g.*, *McDaniels v. Plymouth-Canton Cmty. Sch.*, 755 Fed. App'x 461, 469 (6th Cir. 2018) (*citing Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994)).[5] If the employer meets its burden, the plaintiff must then show that the employer's stated reasons are a pretext — "*i.e.* that the employer's explanation was fabricated to conceal an illegal motive." *McDaniels*, 755 Fed. App'x at 469 (citations omitted).

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). "Although the burdens of production shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (citations omitted).

---

[5] *Manzer* was overruled on other grounds. *See Geiger v. Tower Automotive*, 579 F.3d 614 (6th Cir. 2009).

**A. Treatment of Similarly Situated Employees Outside the Protected Class**

The parties do not dispute that Plaintiff was a member of a protected class, was qualified for the job, and suffered an adverse employment action. Thus, the dispositive issue is whether Plaintiff was treated differently than similarly situated members outside the protected class, and Defendant's motion for summary judgment focuses on this fourth element. (R. 17, PageID# 563). Specifically, Defendant argues that Plaintiff has produced no evidence that he was treated less favorably than a similarly-situated employee outside of his protected class. *Id.*

Here, Plaintiff identifies five individuals who he contends were similarly situated: Elphee—the Contact Supervisor hired around the same time as Plaintiff; Mike Vanderbosch; Brian Geller; Andrew Myers; and, Doug Stock. (R. 19-1, PageID# 927). Plaintiff concedes, however, that he "must show a comparable, non-protected employee was similarly situated to him in all relevant aspects, yet treated more favorably by [Defendant.]" *Id.* (*citing Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002)). Although Plaintiff need not demonstrate an exact correlation in order to be deemed similarly situated to a non-protected employee, "similarly situated, individuals must be comparable in 'all relevant respects.'" *Id.* (*quoting Fuelling v. New Vision Med. Laboratories LLC*, 284 Fed. Appx. 247, 254-256 (6th Cir. 2008) ("Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated.")) (citation omitted). As stated by the Sixth Circuit Court of Appeals in *Mitchell v. Toledo Hospital* and acknowledged in Plaintiff's brief (R. 19, PageID# 927), "to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." 964 F.2d 577, 583

(6th Cir. 1992) (citations omitted).

First, it is not disputed that Elphee, the near contemporaneous hire, was not supervised by Titas, Plaintiff's immediate supervisor, but rather by Zavodnik. (R. 15-1, PageID# 217, Southern Depo. at pp. 146-148; R. 17-3, PageID# 794; R. 17-5, PageID# 828). Under aforementioned Sixth Circuit law, Elphee is not an apt comparator because he was not supervised by the same person who supervised Plaintiff.

Second, Plaintiff's brief in opposition fails to point to any evidence that Elphee or any of the other four alleged comparators engaged in the same or similar conduct as Plaintiff. (R. 19). Moreover, Plaintiff testified during his deposition that he was unaware of whether these other individuals posted worksite images to on-line social media or whether said individuals had been photographed while allegedly sleeping on the job. (R. 15-1, PageID# 219, Southern Depo. at pp. 155-156). By contrast, Defendant's supervisors, Barney and Zavodnik, both stated in their declarations that they were unaware of any other employees who held the same position as Plaintiff—Contact Supervisors—who were photographed while appearing to be sleeping on the job or who posted worksite images on social media. (R. 17-2, PageID# 777; R. 17-3, PageID# 796). Plaintiff's immediate supervisor, Titas, also declared that he was "not aware of any other Contact Supervisors who have been photographed while sleeping on the job, or who have posted inappropriate, BASF related photographs to Facebook." (R. 17-5, PageID# 832). Again, Plaintiff offers no evidence to refute Defendant's evidence. Because Plaintiff cannot to point any evidence that the alleged similarly situated individuals engaged in the same or similar conduct, he has not established a *prima facie* case of race discrimination.

### 1. Plaintiff's Less Training Argument

Plaintiff seeks to overcome this deficiency by asserting that other Contract Supervisors

"informed him that they had received a longer period of training as well as evaluations during their training." (R. 19, PageID# 928). Plaintiff further avers that Elphee received more training in that he was "afforded more access to his fellow Contact Supervisors during his eight hour shift and was therefore afforded more favorable training opportunities." *Id*. Defendant argues that Plaintiff's contention that he received less training is entirely speculative. (R. 20, PageID# 947-948). Plaintiff disagrees, and argues that his belief is based on conversations he allegedly had with other employees. (R. 19, PageID# 929-930). But when asked during deposition, Plaintiff could not point to any training that Elphee received that Plaintiff did not. (R. 15-1, PageID# 217-218, Southern Depo. at pp. 148-149). Instead, Plaintiff generally alleges that Elphee was trained more. *Id*. Plaintiff also has argued that he did not receive periodic job performance reviews as he was being trained, but admitted he had no knowledge of whether Elphee received such reviews. (*Id*. at p. 150). With respect to the other alleged comparators, Plaintiff states they were treated differently because they purportedly received six months of training before taking over their own shift and received periodic reviews. (R. 15-1, PageID# 218-219, Southern Depo. at pp. 152-153). Plaintiff acknowledged, however, that he has no first-hand knowledge to corroborate his allegations because those individuals were trained long before his employment began. *Id*. Rather, he states that these individuals told him this information. *Id*.

"It is well established that a court may not consider hearsay when deciding a summary judgment motion." *Tranter v. Orick*, 460 Fed. App'x 513, 514 (6th Cir. 2012) (*citing Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("'[E]vidence submitted in opposition to a motion for summary judgment must be admissible. Hearsay evidence ... must be disregarded.'"); *accord Henderson v. Chesapeake Expl. LLC*, No. 5:18CV1284, 2019 WL 7372319, at *5 (N.D. Ohio Dec. 31, 2019) (agreeing that hearsay may not be considered during summary judgment but

13

finding that the deposition of a witness taken in another case, even if inadmissible, could create a genuine issue of material fact); *see also Giles v. Univ. of Toledo*, 241 F.R.D. 466, 471 (N.D. Ohio 2007) (declining to consider hearsay statements of third parties contained in the plaintiff's affidavit when ruling on a summary judgment motion). Moreover, as the Sixth Circuit found in *Mitchell*, the decision cited by Plaintiff:

> [T]he District Court correctly found that the Affidavit was not a proper Rule 56(e) affidavit because it was not made on personal knowledge and did not set forth "facts" that would be admissible into evidence. Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law. *See, O'Shea v. Detroit News*, 887 F.2d 683 (6th Cir. 1989); *Simpson v. Midland–Ross Corp.*, 823 F.2d 937 (6th Cir. 1987); *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir. 1984); *Locke v. Commercial Union Insurance Co.*, 676 F.2d 205 (6th Cir. 1982).

*Mitchell*, 964 F.2d 577 at 584–585.

Finally, even assuming *arguendo* that Elphee and/or other Contact Supervisors received more training and Plaintiff, therefore, was treated differently than other Contact Supervisors outside the protected class, Defendant would, nevertheless, be entitled to summary judgment. As explained in the preceding section of this opinion, Plaintiff has failed to establish these other Contact Supervisors were similarly situated because there is simply no evidence they *engaged in the same conduct* as Plaintiff—allegedly sleeping on the job and/or taking worksite pictures that were shared to on-line social media.

### 2. Pretext

Plaintiff also argues the reasons for his termination were pretextual. Plaintiff's argument seeks to bypass an essential step, however. As discussed above, Plaintiff has the burden of establishing a *prima facie* claim of race discrimination under the *McDonnell Douglas* burden-

shifting analysis. Only if a plaintiff establishes a *prima facie* case, does the burden shift to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Manzer*, 29 F.3d at 1082; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 n. 3 (1993) ("Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection") (citations omitted). A court only proceeds to the third step if the *prima facie* case is first established and the employer subsequently meets its burden at the second step. *St. Mary's Honor Center*, 509 U.S. at 515. "Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* Plaintiff's argument—that the basis for his termination was pretextual—does not cure Plaintiff's lack of evidence establishing a *prima facie* case in the first instance. Further, Plaintiff has presented the court with no evidence showing the Plaintiff's alleged sleeping on the job, and/or taking worksite photographs and posting them to social media were pretextual reasons for terminating his employment.[6]

**B. Plaintiff's "Cat's Paw" Theory**

Finally, Plaintiff contends that he is seeking liability under a "cat's paw theory." (R. 19, PageID# 930). Plaintiff contends that his immediate supervisor, Titas, was motivated by a discriminatory animus in failing to assure Plaintiff had adequate training and that he essentially manipulated Zavodnik and Barney into terminating Plaintiff.[7] *Id.*

---

[6] Again, Plaintiff has offered no evidence that any of Defendant's employees engaged in such conduct but were not terminated.

[7] The term "cat's-paw" "[i]n the employment discrimination context … refers to a situation in

15

The relationship between the "cat's paw" theory of liability in employment discrimination claims and the McDonnell-Douglas framework is evolving in the Sixth Circuit, which was aptly addressed by a sister court as follows:

> [B]ecause Shockley's claim is founded upon circumstantial evidence, her claim is analyzed under the *McDonnell-Douglas* framework. Because both that framework and the cat's paw doctrine are under ongoing legal development, it is unclear how the two interact, and courts have found it difficult to consolidate the two. The Eighth Circuit, for example, has deferred extending the cat's paw doctrine to indirect evidence discrimination claims governed by *McDonnell-Douglas*. *See Diaz v. Tyson Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011). Similarly, the Sixth Circuit has "declined to consider whether and to what extent cat's paw liability fits into the *McDonnell Douglas* framework." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 379 (6th Cir. 2017) (quoting *DeNoma v. Hamilton Cty. Court of Common Pleas*, 626 F. App'x 101, 106 (6th Cir. 2015)). However, pending the Sixth Circuit's resolution of the integration matter, the Circuit has provided some guidance regarding the sequence of analysis courts are to employ when considering the two. *See id.* The Circuit, when faced with this issue, has on multiple occasions analyzed the *McDonnell-Douglas* framework first and then considered the cat's paw doctrine second. *Id.* (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339 (6th Cir. 2012)). This Court will do the same here.

*Shockley v. Morristown-Hamblen Hosp. Ass'n*, 2018 U.S. Dist. LEXIS 185305, *12-13 (E.D. Tenn. Mar. 14, 2018); *see also Marshall*, 854 F.3d at 379 (concluding the proper approach is to analyze the *McDonnell Douglas* framework first before proceeding to the cat's paw theory).

Because Plaintiff has failed to satisfy the first step, a *prima facie* claim of race discrimination based on circumstantial evidence under *McDonnell Douglas*, the court need to proceed to the second step of addressing Plaintiff's cat's paw theory.

---

which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 377 (6th Cir. 2017).

## V. Conclusion

For the foregoing reasons, the Defendant's Motion for Summary Judgment (R. 17) is hereby GRANTED and the matter is dismissed.

IT IS SO ORDERED.

                                                        s/ *David A. Ruiz*
                                                        David A. Ruiz
                                                        United States Magistrate Judge

Date:   March 20, 2020